652 A.2d 1117

Charles ELLERIN et al.

v.

FAIRFAX SAVINGS, F.S.B.

No. 13, Sept. Term, 1993.

Court of Appeals of Maryland.

Feb. 3, 1995.

David Freishtat (Stacie F. Dubnow, Freishtat & Sandler, all on brief), Baltimore, for petitioners.

George A. Nilson (Kurt J. Fischer, Marta D. Harting, Piper and Marbury, all on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE,* CHASANOW, KARWACKI and BELL, JJ.

Opinion by ELDRIDGE, Judge.

This case concerns the appropriate standard for the availability of punitive damages in a tort action of fraud or deceit.

## I.

The litigation arose from commercial real estate development loans. In 1982, Charles Ellerin and Louis Seidel decided to acquire four historic buildings in Westminster, Maryland, for commercial development. Ellerin and Seidel planned to

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

develop the properties through a limited partnership, Sherwood Square Associates ("Sherwood"), of which they were the general partners.

Ellerin and Seidel financed their project through Fairfax Savings, F.S.B. ("Fairfax"). Fairfax agreed to lend Sherwood a total of $5,700,000.00, made up of three separate loans. One loan was a conventional loan for $850,000.00.[1] The other two loans were Industrial Revenue Finance Bond (IRB) loans, acquired through the City of Westminster, in the amounts of $3,050,000.00 and $1,800,000.00 respectively.

Because the buildings were initially little more than empty shells, Fairfax was concerned about security for its investment. Fairfax took mortgages on the property and buildings, but also insisted on personal guarantees from the project's principal investors. The nature and extent of these personal guarantees, and Fairfax's methods of securing them, are the subject of the litigation that ensued when, in 1985, Sherwood defaulted on the loans.

The major loan documents had been drafted, reviewed and approved by the parties before settlement. The loan documents for the transaction included a Loan Agreement and a Completion Guaranty for each IRB loan.[2] The Loan Agreements set out Sherwood's obligations with respect to developing the buildings and making payments on the loans, and created liabilities for Ellerin and Seidel in their capacities as general partners of Sherwood. The Completion Guaranties imposed personal obligations on Charles Ellerin and his wife Naoma, on Louis Seidel and his wife Gloria, and on Tri–Ess, a corporation owned by Ellerin and Seidel, that was the general contractor for the project. Fairfax submitted final drafts of the loan documents to the attorney for Ellerin and Seidel on or about December 22, 1982, and the attorney approved those documents.

---

1. This loan was repaid in full, and is not at issue in this litigation.

2. The Loan Agreements and Completion Guaranties were identical for each loan, except for the dollar amount of the loan.

The preapproved documents contained the following provisions governing the existence and duration of loan guarantees. Section 4.1 of the Loan Agreements made Sherwood and the individual partners liable only for breaches of undertakings specified in the Completion Guaranties, "it being the intent that the Land, improvements and rents to issue therefrom shall constitute the sole security and source of funds for the repayment of the Loan" once the buildings were completed. The Completion Guaranties themselves provided that "the obligations of the Guarantors hereunder shall cease and be extinguished ... when the acquisition of the facility has been completed." [3] The obligations of the guarantors under the Completion Guaranties were to complete the buildings according to the specifications, and to secure additional financing to finish the project if necessary.

The preapproved documents imposed no liability on Ellerin and Seidel for repayment of the debt once the buildings had been completed, either in their capacity as the general partners of Sherwood under the Loan Agreements, or in their capacity as guarantors of the project under the Completion Guaranties.

It is undisputed that the preapproved loan documents were different from the documents signed at the settlement on December 29 and 30, 1982. The new Loan Agreements provided that neither Sherwood nor the individual partners would be liable for the loans if the event of default occurred "at any time after the termination of the Completion Guaranty (pursuant to Section 8.1 thereof)...." Section 8.1 of the new Completion Guaranties provided that the guarantors' obligations "shall cease and be extinguished ... when the acquisition of the Facility has been completed and when the Facility Applicant [Sherwood] has fully complied with and satisfied the Rent Roll Requirement." The Rent Roll Requirement, a new addition to the Completion Guaranties, was defined to mean

---

3. "Acquisition" was defined in the Completion Guaranties as "the acquisition, construction, rehabilitation, remodeling, extension, equipping and permanent improvement of the Facility."

the leasing of 70% of the total leaseable space in the finished buildings to tenants approved by Fairfax.

The new obligations of the guarantors were listed in a rewritten section 3.1 of the Completion Guaranties. As in the original documents, the guarantors were required to complete the "acquisition" or construction of the project. A new section added to Section 3.1, however, imposed post-completion guarantees in the event that Sherwood "has not fully complied with and satisfied the Rent Roll Requirement," but "[i]n no event shall the aggregate liability of the Completion Guarantors under this subsection ... exceed $1,150,000...." The parties remain divided over the liability of the parties under the loan documents signed at closing.[4]

Sherwood defaulted on the loans after the buildings were completed but before the Rent Roll Requirement was satisfied. Accordingly, Ellerin and Seidel would be free of liability under the documents approved on or about December 22, but would be liable for a disputed, but substantial, amount under the documents signed at settlement.

When Sherwood defaulted on the loans, Fairfax filed in the Circuit Court for Baltimore County three suits against Ellerin,

---

**4.** Ellerin and Seidel contend that the loan documents, taken as a whole, imposed post-completion liability on them for the entire amount of both IRB loans, $4,850,000.00, until 70% of the buildings were leased. Since the Loan Agreements exculpated Sherwood and the partners only when the Completion Guaranty was terminated "pursuant to Section 8.1 thereof," and since Section 8.1 of the Completion Guaranty defined termination to include satisfaction of the Rent Roll Requirement, Ellerin and Seidel argue that they incurred post-completion liability under the Loan Agreement for the entire amount of the loan.

Fairfax, on the other hand, insists that Ellerin and Seidel could incur a maximum post-completion liability of only $1,150,000.00 for each loan, the amount specified in the Completion Guaranties. While Fairfax concedes that the loan documents can be read as Ellerin and Seidel suggest, it argues that such an interpretation is the result of carelessness and haste in preparing the documents on the part of Fairfax's outside counsel, Weinberg & Green. Fairfax in its brief points to testimony from one of Weinberg & Green's attorneys, to the effect that reading the loan documents to impose full post-completion liability on Ellerin and Seidel under the Loan Agreements was "not [his] intent in drafting the documents and was a mistake."

Seidel and their wives as guarantors, based on the Completion Guaranties, and two suits against Ellerin and Seidel, as general partners of Sherwood, based on the Loan Agreements. Confessed judgments docketed in these cases were vacated after the guarantors filed counterclaims. The counterclaims, setting forth tort causes of action for fraud or deceit, alleged that Fairfax had obtained the post-completion guarantees by fraud. In their counterclaims, the guarantors argued that after their attorney had approved the loan documents on or about December 22, Fairfax had fraudulently changed those documents to insert the post-completion guarantees contained in the documents ultimately signed at settlement, and that the guarantors had never been told of these changes. The guarantors demanded $6,000,000.00 in compensatory damages and $10,000,000.00 in punitive damages for the fraud.

The cases were tried for the first time in 1987. The trial was bifurcated, with the cases based on the Completion Guaranties tried first. During the month-long trial, Fairfax took the position that the guarantors had agreed to the changes in the loan documents. The guarantors introduced evidence that they knew nothing about the changes, and believed that the documents which they signed at settlement imposed no liability that could survive the completion of the buildings.

In response to six questions on a special verdict sheet, the jury found, by clear and convincing evidence, that Fairfax's insertion of the post-completion guarantees into the final loan documents had been fraudulent.[5] The jury also found that the guarantors had ratified the fraud by continuing with the project after they had learned what Fairfax had done. Ac-

---

5. The six questions tracked the elements of a tort action for fraud or deceit in Maryland. The jury found that Fairfax had knowingly inserted the guarantees into the loan documents without the guarantors' knowledge, that the inclusion constituted a false representation of material fact or the concealment of a material fact that Fairfax had a duty to disclose, that the misrepresentation or concealment induced guarantors' belief that they would not incur post-completion liability, that the guarantors relied on Fairfax for their belief that they had no post-completion liability, that the guarantors' reliance on Fairfax was justifiable, and that the guarantors suffered damage.

cording to the instructions on the verdict sheet, this finding required the jury to enter judgment in favor of Fairfax and against the guarantors, and barred the jury from awarding damages against Fairfax on the tort counterclaims.[6] Consequently, the jury returned a verdict in favor of Fairfax in the specified amount.

After the jury verdict in the cases based on the Completion Guaranties, the circuit court granted Fairfax's motion for summary judgment against Ellerin and Seidel in the cases based on the Loan Agreements. The court entered judgment against Ellerin and Seidel for $5,263,688.75, the amount of the unpaid balance of the loans at that time.

The Court of Special Appeals reversed based on the trial court's erroneous conclusion that, because Ellerin and Seidel had continued the contract with Fairfax, they were precluded from seeking damages for the fraud. *Ellerin v. Fairfax Sav. Ass'n,* 78 Md.App. 92, 109–111, 552 A.2d 918, 927–928, *cert. denied,* 316 Md. 210, 557 A.2d 1336 (1989). The intermediate appellate court pointed out that, while the guarantors' continued performance might bar them from the remedy of rescission, they would still be entitled to tort damages based on the fraud.[7] Furthermore, the appellate court held that the erroneous jury instructions had tainted the entire verdict. The Court of Special Appeals remanded the cases for a new trial on all issues, and this Court denied a petition for a writ of

---

**6.** Question 7 on the Verdict Sheet asked the jury if the guarantors had ratified Fairfax's fraud. The verdict sheet contained the following information for the jury:

"If your answer to question 7 is 'yes' then you have concluded that [the guarantors] are barred from claiming a right to have the contract agreements declared null and void or to seek damages from any fraud by Fairfax and your verdict will be in favor of Fairfax against [the guarantors]...."

**7.** With respect to the Court of Special Appeals' holding that a plaintiff, who discovers that his contract was induced by fraud, may continue performance and still recover tort damages in a fraud action, *see generally Sonnenberg v. Security Management,* 325 Md. 117, 599 A.2d 820 (1992).

certiorari. The second trial began on September 25, 1990, and ended almost a month later with a hung jury.

The cases were tried for the third time in 1990, with the liability phase of the trial tried separately from the damages phase. The verdict sheet at the liability phase asked only one question about Fairfax's alleged fraud:

"Are you persuaded that, when Mr. Ellerin signed the documents that he signed on December 29 and/or 30, 1982, neither he nor [his attorney] knew that additional personal guarantees had been inserted into [the Completion Guaranties and Loan Agreements]?"

The jury answered "yes" to this question. The trial court did not instruct the jury on the elements of fraud. Although Fairfax made several objections to the jury instructions, it did not object to the court's failure to give an instruction on the elements of fraud.

The trial court held as a matter of law that the guarantors had ratified the contracts, so that they were liable to Fairfax for the balance then due on the loans. The damages phase of the trial was undertaken to establish the extent of Fairfax's liability in the guarantors' fraud action.

At the damages phase of the trial, the court instructed the jury separately with respect to three different aspects of damages: the judgments entered against the guarantors, other compensatory damages, and punitive damages. In connection with punitive damages, the court told the jury that, while it need not award punitive damages, it could award punitive damages in such an amount "as in your sound judgment and discretion you find will serve to punish Fairfax for the conduct that you have found it engaged in in this case." The trial court refused Fairfax's request that the court instruct the jury with respect to the "malice" required for an award of punitive damages. The court concluded that such an instruction was unnecessary in light of the jury's verdict on liability. As the court put it, "What do you have to say [about malice] in a fraud case? They found fraud." The trial court's position was that actual malice was inherent in the elements of a tort action

for fraud or deceit. In the court's view, if a plaintiff had established the elements of the tort action, he had necessarily established actual malice. Fairfax objected to the court's failure to instruct on actual malice.

The jury awarded both compensatory and punitive damages in the fraud action. The compensatory award included the full amount of the earlier judgment in favor of Fairfax, as well as compensatory "emotional damages" of $1,350,000.00 for Ellerin, and $625,000.00 each for Louis and Gloria Seidel. The total compensatory award against Fairfax, not including the amount that would be set off against Fairfax's judgment, was $2,650,695.00. The jury assessed the amount of punitive damages at $6,000,000.00.

Fairfax appealed. The Court of Special Appeals affirmed the award of compensatory damages on the ground that Fairfax had failed to preserve for appellate review the issues raised concerning liability, including the issue of whether the trial court had erred in failing to instruct the jury on the elements of fraud. *Fairfax Savings v. Ellerin*, 94 Md.App. 685, 695–696, 619 A.2d 141, 145–146 (1993). The Court of Special Appeals vacated the award of punitive damages and ordered a new trial, holding that the trial court should have instructed the jury concerning the malice necessary to support a punitive damages award and holding that Fairfax had fully preserved this issue for appeal. The Court of Special Appeals went on to state (94 Md.App. at 714, 619 A.2d at 155):

"[S]omething more than simple, garden variety fraud is necessary to support a punitive damages award—there must be a breach of fiduciary duty, or gross fraud, or other extraordinary or exceptional circumstances from which actual malice may be inferred."

Both sides filed petitions for a writ of certiorari. Fairfax sought review of the issues relating to liability and to compensatory damages. Ellerin and the other guarantors challenged the Court of Special Appeals' grant of a new trial on punitive damages. We denied Fairfax's petition and granted the guar-

antors' petition. Therefore, the issue before us relates to the basis for punitive damages in an action of fraud or deceit.

## II.

The policy underlying awards of punitive damages in Maryland has been articulated in our cases for over a century. In *Phil., Wilm. & Balt. Railroad Co. v. Hoeflich*, 62 Md. 300, 304 (1884), in which the plaintiff was wrongfully ejected from a railroad car, this Court explained that punitive damages penalize a defendant for his wrongfulness or "malice" (62 Md. at 307):

> "[T]o entitle one to such damages there must be an element of fraud, or malice, or evil intent ... entering into and forming part of the wrongful act. It is in such cases as these that exemplary or punitive damages are awarded as a punishment for the evil motive or intent with which the act is done, and as an example or warning to others. But where the act, although wrongful in itself, is committed in the honest assertion of a supposed right—or in the discharge of duty, or without any evil or bad intention, there is no ground on which such damages can be awarded."

We have recently reaffirmed that this is the basis for awarding punitive damages. In *Owens–Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992), the Court set forth the standards governing awards of punitive damages in nonintentional tort cases. In doing so, we reviewed the purpose of punitive damages under Maryland law (325 Md. at 454, 601 A.2d at 649–650):

> " '[T]he purposes of punitive damages relate entirely to the nature of the defendant's conduct.' *Schaefer v. Miller*, [322 Md. 297, 321, 587 A.2d 491, 503 (1991) ] .... [T]he availability of a punitive damages award ought to depend upon the heinous nature of the defendant's tortious conduct. *Schaefer*, 322 Md. at 321–322, 587 A.2d at 503. *See, e.g., Vancherie v. Siperly*, 243 Md. 366, 373–374, 221 A.2d 356, 360 (1966); *McClung–Logan v. Thomas*, 226 Md. 136, 148, 172 A.2d 494, 500 (1961); *Davis v. Gordon*, [183 Md. 129, 133–134, 36 A.2d

699, 701 (1944)]; *Heinze v. Murphy,* 180 Md. 423, 431–432, 24 A.2d 917, 921–922 (1942); *Nichols v. Meyer,* 139 Md. 450, 457, 115 A. 786, 788 (1921); *Baltimore and Ohio R.R. Co. v. Boyd,* 63 Md. 325, 334–335 (1885).

"Awarding punitive damages based upon the heinous nature of the defendant's tortious conduct furthers the historical purposes of punitive damages—punishment and deterrence. *Schaefer v. Miller, supra,* 322 Md. at 321, 587 A.2d at 503; *Embrey v. Holly,* 293 Md. 128, 142, 442 A.2d 966, 973 (1982); *First Nat'l Bank v. Fid. & Dep. Co.,* 283 Md. 228, 232, 389 A.2d 359, 361 (1978). Thus, punitive damages are awarded in an attempt to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability."

Furthermore, in *Adams v. Coates,* 331 Md. 1, 13, 626 A.2d 36, 42 (1993), the Court stated that the policy explained in *Zenobia* generally "should govern any award of punitive damages," including punitive damages arising from intentional torts. *See also Komornik v. Sparks,* 331 Md. 720, 725, 629 A.2d 721, 723 (1993).

■ Accordingly, with regard to most types of tort actions, Maryland law has limited the availability of punitive damages to situations in which the defendant's conduct is characterized by knowing and deliberate wrongdoing. In *Owens–Illinois v. Zenobia, supra,* this Court rejected a gross negligence standard for the availability of punitive damages in non-intentional tort cases. We specifically overruled the negligence and product liability cases which had permitted punitive damages to be awarded on the basis of "implied malice," where implied malice was defined as "gross negligence." [8] Instead, the

---

8. The term "implied malice" has also been used with regard to the availability of punitive damages in certain types of tort cases which have allowed "malice" to be "implied" from another element of the tort. *See, e.g., Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 448, 340 A.2d 705, 709–710 (1975) (upholding a punitive damages award in a false arrest case because "malice may be implied from ... want of probable cause in a case of false arrest"); *Safeway Stores v. Barrack,*

Court held that punitive damages may only be awarded in such cases when "the plaintiff has established that the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud, *i.e.*, 'actual malice.'" 325 Md. at 460, 601 A.2d at 652.[9]

Thus, in this case it is appropriate to examine the elements of the tort of fraud or deceit for the purpose of determining to what extent the tort inherently involves the state of mind and conduct which is ordinarily required for the allowability of punitive damages.

### III.

This Court recently summarized the elements of the tort action of fraud or deceit in *Nails v. S & R*, 334 Md. 398, 415–416, 639 A.2d 660, 668–669 (1994):

"In order to recover damages in an action for fraud or deceit, a plaintiff must prove (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. *Everett v. Baltimore Gas & Elec.*, 307

---

210 Md. 168, 177, 122 A.2d 457, 462 (1956) (in a malicious prosecution action, malice inferred from the want of probable cause is sufficient to sustain a punitive damages award); *McNamara v. Pabst*, 137 Md. 468, 473, 112 A. 812, 814 (1921). The continuing viability of this doctrine is not before us in the present case.

**9.** In *Owens–Illinois v. Zenobia, supra*, 325 Md. at 460 n. 20, 601 A.2d at 652 n. 20, we recognized that the terms "malice" and "actual malice" have meant different things in the law and that their use has been criticized. We went on to state (*ibid.*):

"Nevertheless, we simply use the term [actual malice] in this opinion as a shorthand method of referring to conduct characterized by evil motive, intent to injure, ill will, or fraud. In instructing juries with respect to punitive damages, however, it would be preferable for trial judges not to use the term 'actual malice.'"

Md. 286, 300, 513 A.2d 882, 889 (1986); *Martens Chevrolet v. Seney*, 292 Md. 328, 333–334, 439 A.2d 534, 537–538 (1982); *James v. Weisheit*, 279 Md. 41, 44–45, 367 A.2d 482, 484–485 (1977); *Suburban Mgmt. v. Johnson*, 236 Md. 455, 460, 204 A.2d 326, 329 (1964); *Schmidt v. Millhauser*, 212 Md. 585, 592–593, 130 A.2d 572, 575–576 (1957); *Appel v. Hupfield*, 198 Md. 374, 378–379, 84 A.2d 94, 95–96 (1951); *Gittings v. Von Dorn*, 136 Md. 10, 15–16, 109 A. 553, 554–555 (1920); *Donnelly v. Baltimore Trust Co.*, 102 Md. 1, 13, 61 A. 301, 306 (1905); *Boulden v. Stilwell*, 100 Md. 543, 552, 60 A. 609, 610 (1905); *Cahill v. Applegarth*, 98 Md. 493, 499–504, 56 A. 794, 795–797 (1904); *Robertson v. Parks*, 76 Md. 118, 131–133, 24 A. 411, 412–413 (1892); *McAleer v. Horsey*, 35 Md. 439, 452–454 (1872)."

In deciding whether the second and third elements describe the kind of evil motive or bad intent which may justify a punitive damages award in Maryland, we first consider the requirement that the defendant's representation be made with an intent to defraud the plaintiff.

██ In what is still the leading Maryland case on the tort of fraud or deceit, *McAleer v. Horsey*, 35 Md. 439 (1872), our predecessors described the intent that characterizes the tort as follows (35 Md. at 453):

" 'An action cannot be supported for telling a bare naked lie, *i.e.*, saying a thing which is false, knowing or not knowing it to be so, and without any intention that another should rely upon the false statement and act upon it; but if a falsehood be knowingly told, with an intention that another should believe it to be true and act upon it, and that person does act upon it and thereby suffers damage, the party telling the falsehood is responsible in damages in an action for deceit. . . .' "

Therefore, recovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive. *See also Nails v. S & R, supra*, 334 Md. at 415, 639 A.2d at 668; *B.N. v. K.K.*, 312 Md. 135, 149, 538 A.2d 1175, 1182 (1988); *Martens Chevrolet v. Seney*, 292 Md. 328, 333,

439 A.2d 534, 537 (1982); *Appel v. Hupfield,* 198 Md. 374, 378–379, 84 A.2d 94, 96 (1951); *Gittings v. Von Dorn,* 136 Md. 10, 15, 109 A. 553, 554 (1920); *Donnelly v. Baltimore Trust Co.,* 102 Md. 1, 13, 61 A. 301, 306 (1905); *Robertson v. Parks,* 76 Md. 118, 132, 24 A. 411, 413 (1892).

The other mental element of fraud, and perhaps the most troublesome element of the tort, is the requirement concerning the defendant's knowledge of the falsity. The plaintiff in an action of fraud or deceit must prove that the defendant either knew that the representation was false or made the representation with "reckless indifference" as to its truth. With regard to the "reckless indifference" alternative, although several Maryland cases use the phrases "reckless indifference" or "reckless disregard," the words do not signify a representation which the defendant, through negligence, believes to be true. Instead, the words seemed to be used in fraud cases to connote the defendant's awareness that he does not know whether the representation is true or false.

Thus in *Robertson v. Parks, supra,* 76 Md. at 131, 24 A. at 412, Chief Judge Alvey for the Court explained:

"It is not necessary in all cases to show that the defendant *knew* at the time that the representation made by him was false in fact. It is sufficient if the statement be made for a fraudulent purpose and without a *bona fide* belief in its truth by the defendant, with the intention of inducing the plaintiff to do an act...."

And later the Court reiterated (76 Md. at 132, 24 A. at 413):

"It is only necessary to show that the defendant pretended to a knowledge which he must, according to principles of reason and good faith, have known that he did not possess at the time of the misrepresentation made."

In *Cahill v. Applegarth,* 98 Md. 493, 56 A. 794 (1904), this Court reversed a judgment for the plaintiff in a fraud case. The trial court in that case had instructed the jury that it might find fraud if the defendant's representations " 'were either known to the defendant to be false, or by the exercise of ordinary care ... ought in your judgment to have been known

by him to be false.' " 98 Md. at 499, 56 A. at 795. Recognizing that this instruction substituted negligence for knowledge of the falsity, this Court concluded that only a defendant's knowledge that a representation was false, or his knowledge that he did not know whether the statement was true or false, would suffice in a tort action of fraud or deceit (98 Md. at 502, 56 A. at 797):

"The general rule undoubtedly is that in actions for deceit there must be knowledge of the falsity, by the party making the representation, and hence scienter must be expressly alleged and proven, or there must be such allegations and proof as import knowledge."

The Court in *Cahill v. Applegarth, supra,* held that no representation believed by its speaker to be true can give rise to a cause of action in tort for fraud or deceit, no matter how false the representation is, or how negligent the speaker's belief may be. The Court emphasized (98 Md. at 502, 56 A. at 796):

" 'The representation upon which it is based must be shown not only to have been false and material, but that the defendant when he made it knew that it was false, or not knowing whether it was true or false and not caring what the facts might be, made it recklessly, paying no heed to the injury which might ensue. Misjudgment, however gross, or *want of caution,* however marked, *is not fraud.*' "

Consequently, a defendant is liable in a tort action of fraud or deceit only if he knows that his representation is false, or is recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity. In addition, the defendant must intend to mislead the plaintiff; his misrepresentation must in fact mislead the plaintiff, and the plaintiff must suffer injury resulting therefrom.

Although Maryland cases since *McAleer v. Horsey, supra,* 35 Md. 439, have consistently stated that the tort of fraud or deceit may be committed by a defendant who is recklessly indifferent to the truth of the statement that deceives the plaintiff, there appears to be no decision of this Court sustaining a judgment in favor of the plaintiff on this basis. The

fraud cases in this Court have generally involved findings or allegations that the falsity of the representation was actually known to the defendant. Moreover, the defendant's motives have invariably been dishonest, corrupt or immoral. *See, e.g., Nails v. S & R, supra,* 334 Md. at 403, 639 A.2d at 662; *B.N. v. K.K., supra,* 312 Md. at 153, 538 A.2d at 1184; *Everett v. Baltimore Gas & Elec.,* 307 Md. 286, 300–301, 513 A.2d 882, 890 (1986); *James v. Weisheit,* 279 Md. 41, 43, 367 A.2d 482, 484 (1977); *Schmidt v. Millhauser,* 212 Md. 585, 130 A.2d 572 (1957); *Gittings v. Von Dorn, supra,* 136 Md. 10, 109 A. 553; *Boulden v. Stilwell,* 100 Md. 543, 60 A. 609 (1905); *Buschman & Cook v. Codd,* 52 Md. 202 (1879); *McAleer v. Horsey, supra,* 35 Md. at 459.

## IV.

When a tort was committed willfully and with knowledge of the wrong, instead of by ignorance, mistake or negligence, this Court very early held that it was committed with the requisite "bad motive" to allow punitive damages. Thus, in *Ridgely v. Bond & Wife,* 17 Md. 14, 20–21, 22–23 (1861), an action of trespass *quare clausum fregit,* this Court agreed that one who "may innocently appropriate his neighbor's property, supposing it to be his own," is liable only for compensatory damages, but when he "does so, knowing it not to be his own, he is liable in vindictive damages." *See Schindel v. Schindel,* 12 Md. 108, 122–123 (1858) ("The man who, from bad and malicious intentions, commits a trespass, ought, in justice, to be dealt with more harshly than one who acts . . . ignorantly"); *Barton Coal Co. v. Cox,* 39 Md. 1, 30 (1873) (action of trespass *quare clausum fregit* and trespass *de bonis asportatis* where the Court held, *inter alia,* "that knowledge on the part of the defendant, that the '*locus in quo*' was not its own lands, at the time the trespasses were committed, entitled the plaintiffs to exemplary damages").

More recently, this Court has reaffirmed the principle that punitive damages liability must be based on the defendant's conscious wrongdoing. In *Owens–Illinois v. Zenobia, supra,* 325 Md. at 460, 601 A.2d at 652, the Court held that "[i]n a

non-intentional tort action, the trier of facts may not award punitive damages unless the plaintiff has established that the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud, *i.e.*, 'actual malice'." Applying this principle to products liability cases, the Court held that "actual malice" in the context of products liability included "(1) actual knowledge of the defect on the part of the defendant, and (2) the defendant's conscious or deliberate disregard of the foreseeable harm resulting from the defect." *Owens–Illinois v. Zenobia, supra*, 325 Md. at 462, 601 A.2d at 653. The Court further explained the knowledge requirement as follows (325 Md. at 462, 601 A.2d at 653–654):

"The knowledge component, which we hold is necessary to support an award of punitive damages, does *not* mean 'constructive knowledge' or 'substantial knowledge' or 'should have known.' More is required to expose a defendant to a potential punitive damages award. The plaintiff must show that the defendant *actually* knew of the defect and of the danger of the product at the time the product left the defendant's possession or control."

As we have discussed, the Maryland cases concerning fraud or deceit have typically involved the form of the tort which is characterized by the defendant's deliberate deception of the plaintiff by means of a representation which he knows to be false. We believe that the defendant's actual knowledge of falsity, coupled with his intent to deceive the plaintiff by means of the false statement, constitutes the actual malice required to support an award of punitive damages. *See* Sedgwick, *A Treatise on the Measure of Damages* § 367 (8th ed. 1891), ("it is difficult to see how a fraudulent tort can be accomplished without a malicious intent"). From our earliest decisions to the present day, this Court has consistently listed "fraud" among the types of dishonest or immoral conduct for which punitive damages are recoverable. *See, e.g., Komornik v. Sparks, supra,* 331 Md. at 727, 629 A.2d at 725 (defining "actual malice" as conduct "characterized by evil motive, intent to injure, ill will, or fraud"); *Adams v. Coates, supra,* 331 Md. at 13, 626 A.2d at 42 (punitive damages are not available

in the "absence of malice or fraud"); *Owens–Illinois v. Zenobia, supra,* 325 Md. at 462, 601 A.2d at 653 (describing "the 'evil motive,' 'intent to defraud,' or 'intent to injure,' which generally characterize[ ] 'actual malice' "); *Davis v. Gordon,* 183 Md. 129, 133, 36 A.2d 699, 701 (1944) (" 'to entitle one to [punitive] damages there must be an element of fraud, or malice, or evil intent' "); *Baltimore & Ohio R.R. Co. v. Boyd,* 63 Md. 325, 334–335 (1885) (requiring fraud, malice, or evil intent); *Phil., Wilm. & Balt. Railroad Co. v. Hoeflich, supra,* 62 Md. at 307 (same). *See also Jannenga v. Johnson,* 243 Md. 1, 5, 220 A.2d 89, 91 (1966) (equating "actual fraud" with conduct "compelled by malicious motives").

■ Consequently, the elements of the tort of fraud or deceit in Maryland, where the tort is committed by a defendant who knows that his representation is false, include the type of deliberate wrongdoing and evil motive that has traditionally justified the award of punitive damages.[10]

■ On the other hand, when a particular fraud or deceit action is based on the alternative form of the knowledge element, namely a "reckless disregard" as to the truth of the representation, the traditional basis for the allowability of punitive damages is not present. As we have earlier explained, "reckless disregard" in this context does not mean a situation where the defendant honestly, but negligently, believed that the representation was true. Nevertheless, it does not mean actual knowledge of the falsity. Under the principles set forth in several of our earliest cases, and reaffirmed in *Owens–Illinois v. Zenobia* and other recent cases, "reckless disregard" or "reckless indifference" concerning the truth of the representation falls short of the mens rea which is required to support an award of punitive damages.

-----

10. As this Court explained in *Owens–Illinois v. Zenobia, supra,* 325 Md. at 462 n. 23, 601 A.2d 654 n. 23, actual knowledge "does include the wilful refusal to know." *See State v. McCallum,* 321 Md. 451, 458–461, 583 A.2d 250, 253–255 (1991) (Chasanow, J., concurring).

 Likewise, other conduct, recognized by the law and sometimes labeled "fraud," falls short of the act of deliberate deception required for actual malice in this context, and is not sufficient to sustain a punitive damages award. For example, while "constructive fraud" has been recognized for certain purposes in Maryland, it does not necessarily involved the type of dishonest or immoral conduct that is required to support an award of punitive damages.[11] *See Jannenga v. Johnson, supra,* 243 Md. at 5, 220 A.2d at 91; *Whitehurst v. Barnett,* 161 Md. 444, 157 A. 737 (1932). Similarly, the "fraud" that justifies rescission of a contract generally does not require proof of wrongful conduct.[12] *See Steele v. Goettee,* 313 Md. 11, 22, 542 A.2d, 847, 853 (1988); *Creamer v. Helferstay,* 294 Md. 107, 116–117, 448 A.2d 332, 337 (1982); *Babb v. Bolyard,* 194 Md. 603, 609, 72 A.2d 13, 16 (1950); *Hutson v. Hutson,* 168 Md. 182, 186–187, 177 A. 177, 179 (1935); *Tucker v. Osbourn,* 101 Md. 613, 618, 61 A. 321, 322–323 (1905); *Cahill v. Applegarth, supra,* 98 Md. at 503–504, 56 A. at 797; *Joice v. Taylor,* 6 G. & J. 54, 58 (1833).

## V.

 The Court of Special Appeals in this case correctly held that "actual malice must be proven for recovery of punitive damages in an action for fraud." *Fairfax Savings v. Ellerin, supra,* 94 Md.App. at 710, 619 A.2d at 153. Neverthe-

---

**11.** Constructive fraud has been defined as follows, *Scheve v. McPherson,* 44 Md.App. 398, 406, 408 A.2d 1071, 1076 (1979):

" 'Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.' "

**12.** In *Shulton, Inc. v. Rubin,* 239 Md. 669, 686, 212 A.2d 476, 486 (1965), this Court explained as follows:

"[A] false representation of a material fact devoid of intent to deceive will not support an action in deceit at law but a material misrepresentation of fact, though there be no actual moral delinquency, may warrant rescission by a court of equity of a contract induced thereby."

less, the intermediate appellate court further held that proof of fraud, even when based on the defendant's actual knowledge of the falsity, was not a sufficient predicate for punitive damages liability. The court was of the view that "additional proof" of some further aggravating circumstances was needed if punitive damages were to be recovered. 94 Md.App. at 712–713, 619 A.2d at 154. In reaching this conclusion, the Court of Special Appeals relied on *Russell v. Stoops*, 106 Md. 138, 66 A. 698 (1907), and *Fowler v. Benton*, 245 Md. 540, 226 A.2d 556, *cert. denied*, 389 U.S. 851, 88 S.Ct. 42, 19 L.Ed.2d 119 (1967).

In *Russell v. Stoops, supra*, this Court reversed a judgment for the plaintiff in a fraud action "for error in not sustaining the demurrer to the declaration," as well as for other errors committed by the trial court. 106 Md. at 147, 66 A. at 701. In dicta, and without citing a single case, the Court in *Russell* quoted from an encyclopedia of the time as follows (106 Md. at 143–144, 66 A. at 700):

" 'In ordinary cases the recovery of exemplary, punitive, or vindictive damages will not be allowed in an action of deceit; but such damages may be allowed where the wrong involves some violation of duty springing from a relation of trust or confidence, or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly indicating malice and wilfulness and calling for an extension of the doctrine.' "

In *Fowler v. Benton, supra*, 245 Md. at 552–553, 226 A.2d at 564, the Court, again as dicta, repeated the same quotation. The holding in *Fowler* was that the issues relating to punitive damages had not been preserved for appellate review. In light of the numerous cases in this Court taking the position that "actual malice" to support an award of punitive damages includes fraud, and in light of the elements of a tort action for fraud or deceit, the mere quotation from an encyclopedia in the *Russell v. Stoops* case furnishes little authority for the Court of Special Appeals' position.

The quotation from the encyclopedia in *Russell v. Stoops* may well have reflected developments in the law of fraud in

those jurisdictions which had expanded the tort to include liability for negligent or grossly negligent misrepresentations. This situation exists today in a number of jurisdictions. *See, e.g., Smith v. Renaut,* 387 Pa.Super. 299, 306, 564 A.2d 188, 192 (1989); *Hines v. Amole,* 4 Ohio App.3d 263, 269, 448 N.E.2d 473, 479–480 (1982); *Moore Ford Co. v. Smith,* 270 Ark. 340, 346–347, 604 S.W.2d 943, 947 (1980); *Mayfield Motor Co., Inc. v. Parker,* 222 Miss. 152, 159, 75 So.2d 435, 437 (1954); *Rosenberg v. Howle,* 56 A.2d 709, 712 (D.C.1948). In many of those jurisdictions which have expanded the tort of fraud to also encompass negligent falsehoods, proof of fraud alone generally does not entitle a plaintiff to punitive damages. Rather, additional aggravating circumstances are required before punitive damages may be awarded. *See BWX Electronics, Inc. v. Control Data Corp.,* 929 F.2d 707, 712–713 (D.C.Cir.1991) (applying *Feltman v. Sarbov,* 366 A.2d 137, 141 (D.C.1976)); *German Auto, Inc. v. Tamburello,* 565 So.2d 238, 240 (Ala.1990) ("Punitive damages may be awarded if there is a finding of intent to deceive or defraud. . . . However, if the representation was mistakenly and innocently made, then only compensatory damages are recoverable"); *Smith v. Renaut, supra,* 387 Pa.Super. at 309, 564 A.2d at 193; *Gardner v. Jones,* 464 So.2d 1144, 1149–1150 (Miss.1985) (vacating punitive damages award based on a negligent misrepresentation "[b]ecause there is no evidence in this record of actual fraudulent or malicious intent on the part of [the defendant]"); *Ray Dodge, Inc. v. Moore,* 251 Ark. 1036, 1043, 479 S.W.2d 518, 522 (1972) (holding that if "there was evidence tending to show that [the defendant] intentionally performed a deliberate act with the intention of misleading a prospective purchaser about a material matter to his injury, it was proper to permit the jury to consider the award of exemplary or punitive damages").

In contrast with changes in the law in some jurisdictions, the tort of fraud or deceit in Maryland has remained the same since 1872, when our predecessors defined it in *McAleer v. Horsey, supra,* 35 Md. 439. *See Martens Chevrolet v. Seney, supra,* 292 Md. at 333, 439 A.2d at 537. This Court has

repeatedly refused to expand the tort to encompass liability for negligent or grossly negligent representations. In *Cahill v. Applegarth, supra,* 98 Md. at 502, 56 A. at 796, the Court emphatically stated:

> " 'The gravamen of the action is actual fraud, and nothing less will sustain it. . . . Misjudgment, however gross, or *want of caution,* however marked, *is not fraud.* Intentional fraud, as distinguished from a mere breach of duty or *the omission to use due care,* is an essential factor in an action for deceit.' "

Later, in *Boulden v. Stilwell, supra,* 100 Md. at 552, 60 A. at 610, the Court again stated that

> "[t]he foundation of the action is actual fraud, and nothing short of this will suffice. Consequently, a misrepresentation believed by the speaker to be true, though induced by his ignorance or negligence, will not sustain an action for deceit."

The Court in *Donnelly v. Baltimore Trust Co., supra,* 102 Md. at 13, 61 A. at 306, indicated that one who negligently makes a misrepresentation might be liable in an action other than fraud or deceit, "but he is not liable in this form of action—which has as its basis actual fraud. . . ."

In *Babb v. Bolyard, supra,* 194 Md. at 608–609, 72 A.2d at 16, the Court pointed out that, "[i]n some states the action for deceit has been expanded . . . to cover, besides actual fraud, negligent misrepresentation," but that in Maryland, " '[t]he foundation of the action is actual fraud and nothing short of this will suffice.' " *See Appel v. Hupfield, supra,* 198 Md. at 379, 84 A.2d at 96 ("But the law is equally clear in Maryland that there can be no recovery in an action for deceit on the ground of negligent misrepresentation"). *See also Schmidt v. Millhauser, supra,* 212 Md. at 592, 130 A.2d at 575; *Holt v. Kolker,* 189 Md. 636, 639, 57 A.2d 287, 288 (1948).

Other jurisdictions, like Maryland, that restrict the tort of fraud or deceit to its traditional elements, generally hold that proof of fraud, without more, is sufficient for the availability of punitive damages. *See, e.g., O'Leary v. Industrial Park*

*Corp.,* 211 Conn. 648, 651, 560 A.2d 968, 970 (1989); *Amber Properties v. Howard Elec. & Mech.,* 775 P.2d 43, 46 (Colo. App.1988); *First Interstate Dev. v. Ablanedo,* 511 So.2d 536, 539 (Fla.1987) ("[P]roof of fraud sufficient to support compensatory damages necessarily is sufficient to create a jury question regarding punitive damages. This is so because intentional misconduct is a necessary element of fraud"); *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 50, 477 A.2d 1224, 1231 (1984) ("it is especially fitting to allow punitive damages for actions such as legal fraud, since intent rather than mere negligence is the requisite state of mind"); *Shaver v. N.C. Monroe Constr. Co.,* 63 N.C.App. 605, 616, 306 S.E.2d 519, 526 (1983) ("punitive damages may be recovered as a matter of law in fraud cases, because fraud, by its very nature, involves the element of aggravation or intentional wrongdoing"). Furthermore, where the torts of intentional fraud and negligent misrepresentation are distinct within a single jurisdiction, different punitive damages standards have been applied to each. *Compare, e.g., McMullin v. Murphy,* 89 Or.App. 230, 234, 748 P.2d 171, 173 (1988) (holding that "evidence sufficient to establish intentional fraud is also necessarily sufficient to support the requisite findings for the imposition of punitive damages") *with Schmidt v. Pine Tree Land Development Co.,* 291 Or. 462, 466, 631 P.2d 1373, 1375 (1981) (in banc) (requiring, in the case of reckless misrepresentation, something more than the elements of the tort to support punitive damages).

■ Consequently, although some jurisdictions require proof of more than fraud for the availability of punitive damages, while other jurisdictions make punitive damages available on the basis of proof of fraud alone, the underlying basis for punitive damages awards in fraud actions is ordinarily the same—the defendant's knowledge of the falsity and deliberate wrongdoing. In our view, a person's actual knowledge that his statement is false, coupled with his intent to deceive another by means of that statement, constitute the "actual malice" required for the availability of punitive damages.

## VI.

In the present case, the trial court held that the "actual malice" required to support an award of punitive damages is inherent in the elements of a tort action for fraud or deceit. This holding was, of course, too broad, as the trial court did not, and could not have been expected to, anticipate the distinction which we have drawn between actual knowledge of the falsity and "reckless indifference." Moreover, the jury which awarded the punitive damages had not been instructed on the elements of the tort. In addition, the specific factual finding on the verdict sheet did not reflect the elements of fraud or deceit. The jury's sole factual finding in connection with the alleged fraud was that, "when Mr. Ellerin signed the documents that he signed on December 29 and/or 30, 1982, neither he nor [his attorney] knew that additional personal guarantees had been inserted into [the Completion Guaranties and Loan Agreements]." The jury did not expressly find that any officer or agent of Fairfax knew that the documents had been changed without the guarantors' knowledge or consent, or that any agent of Fairfax intended to deceive the guarantors into undertaking additional guaranty obligations.

In light of the holding of the Court of Special Appeals that Fairfax, at the liability stage of the trial, had failed to preserve for appellate review any issue concerning jury instructions on the elements of fraud, and in light of this Court's denial of certiorari with respect to that holding, we have no issue before us concerning the award of compensatory damages. Nonetheless, the trial court's failure to instruct the jury on the elements of fraud is pertinent to the award of punitive damages. This jury was at no time instructed on the appropriate basis for a punitive damages award, and, as held by the Court of Special Appeals, this issue was fully preserved for appellate review. Thus, we agree with the Court of Special Appeals that the award of punitive damages should be vacated and the case remanded for a new trial on punitive damages. The new trial should be conducted in accordance with the principles set forth in this opinion.

In both the Court of Special Appeals and in this Court, Fairfax has also challenged the punitive damages award on other grounds, including the argument that the amount of the punitive damages award was excessive. Since we have ordered a new trial on punitive damages, we shall, for the guidance of the trial court on remand, comment on one feature of Maryland law concerning punitive damages.

Since the earliest days, this Court has held that punitive damage awards must not be disproportionate to the gravity of the defendant's wrong. *See, e.g., Embrey v. Holly,* 293 Md. 128, 141–142, 442 A.2d 966, 973 (1982) ("punitive damages ... must relate to the degree of culpability ... and ... ability to pay"); *Schloss v. Silverman,* 172 Md. 632, 644, 192 A. 343, 348 (1937) (pointing out, with respect to punitive damages, that "the 'punishment [must] fit the crime' "); *Moore v. Schultz,* 31 Md. 418, 424 (1869) (punitive damages "should not be disproportioned to the enormity of the case"). Upon request, a jury should be instructed that punitive damages should not be disproportionate to either the wrongfulness of the defendant's conduct or the defendant's ability to pay. Moreover, like any award of damages in a tort case, the amount of punitive damages awarded by a jury is reviewable by the trial court for excessiveness. *See, e.g., Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969, 976 (1988); *Conklin v. Schillinger,* 255 Md. 50, 64, 257 A.2d 187, 194 (1969); *Turner v. Wash. Sanitary Comm.,* 221 Md. 494, 503, 158 A.2d 125, 130 (1960).[13]

---

13. We have recently seen several multi-million dollar punitive damages awards for alleged tortious conduct in the course of commercial activity. As previously discussed, punitive damages are intended to punish and deter "heinous" or "outrageous" conduct. *See Schaefer v. Miller,* 322 Md. 297, 321, 587 A.2d 491, 503 (1991) (concurring opinion). As stated by the Court in *Embrey v. Holly, supra,* 293 Md. at 142, 442 A.2d at 973, "[p]unitive damages, in essence, represent a civil fine...." In this connection, it is noteworthy that the largest maximum fine prescribed by the Maryland General Assembly for any single criminal offense is $1,000,000.00 under the drug kingpin statute, Maryland Code (1957, 1992 Repl.Vol., 1994 Cum.Supp.), Art. 27, § 286(g)(2)(ii). The greatest maximum fine for a so-called "commercial" crime is $500,-

*JUDGMENT OF THE COURT OF SPECIAL APPEALS WITH RESPECT TO COMPENSATORY DAMAGES AFFIRMED. JUDGMENT OF THE COURT OF SPECIAL APPEALS WITH RESPECT TO PUNITIVE DAMAGES VACATED, AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO VACATE THE JUDGMENT FOR PUNITIVE DAMAGES OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR A NEW TRIAL ON PUNITIVE DAMAGES IN ACCORDANCE WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE EVENLY DIVIDED BETWEEN THE PETITIONERS AND THE RESPONDENT.*

BELL, Judge, concurring and dissenting.

The majority quite properly rejects the notion, espoused, and, indeed, held by the Court of Special Appeals, "that proof of fraud, even when based on the defendant's actual knowledge of its falsity, was not a sufficient predicate for punitive damages liability" and "that 'additional proof' of some further aggravated circumstances was needed if punitive damages were to be recovered." 337 Md. 216, 237, 652 A.2d 1117, 1127. I also agree with the majority that proof of "actual malice" is a prerequisite for recovery of punitive damages in a fraud action; the mental aspect of the tort mandates that one who perpetrates the tort have "actual knowledge" that the state-

000.00 under the Maryland antitrust statute, Code (1975, 1990 Repl. Vol., 1994 Cum.Supp.), § 11–212 of the Commercial Law Article. Article 27 of the Maryland Code includes numerous fraud offenses, with the largest maximum fine for any of these being $10,000.00. *See* Art. 27, § 174 (setting $10,000.00 maximum penalty for the crime of fraudulent misrepresentation by a corporate officer or agent); Art. 27, § 230D ($10,000.00 maximum penalty for Medicaid fraud).

There are other pertinent considerations in fixing an amount of punitive damages, and we do not suggest that criminal monetary penalties should provide a cap for punitive damage awards. Nonetheless, in determining whether an award of punitive damages is proportionate to the defendant's misconduct, a court may consider, *inter alia*, the legislative policy reflected in statutes setting criminal fines.

ment is a misrepresentation. The majority defines "actual knowledge" to exclude the situation in which the perpetrator is consciously aware (has actual knowledge) that he or she does not know whether the representation is true or false. It is with this proposition that I do not agree. It is my view, in other words, that the requisite mental state authorizing consideration of punitive damages is inherent in the elements of fraud or deceit, as that tort has traditionally been defined by this Court. I fully agree with the circuit court in that regard.

It has long been the law of Maryland and, thus, well settled, that a defendant, intending to mislead the plaintiff and fully aware that he or she does not know whether the representation he or she makes is true or false, commits the tort of fraud or deceit. *E.g., Robertson v. Parks,* 76 Md. 118, 131, 24 A. 411, 412 (1892). The rationale underlying the rule is that making a representation of a fact, with intent to deceive and actual knowledge that the speaker does not know whether it is fact or not, is as much a misrepresentation as one made with actual knowledge of falsity and that actual knowledge of the former is as reprehensible as actual knowledge of the latter. Fully recognizing the state of the law, *see* 337 Md. at 229–233, 652 A.2d at 1123–1125, but noting that "Maryland cases concerning fraud or deceit have typically involved the form of the tort which is characterized by the defendant's deliberate deception of the plaintiff by means of a representation which he knows to be false," the majority nevertheless "refines" the actual knowledge prong of the tort, to include only that situation. *Id.* 337 Md. at 234, 652 A.2d at 1126. And it does so, fully cognizant that, as traditionally understood, the tort countenanced no amount of negligence, however gross. *See* 337 Md. at 236–239, 652 A.2d at 1127–1128. There is absolutely no basis for the majority's change of the law.

I also agree with the circuit court's judgment, which is reflective of heretofore well established principles. Thus, in my humble opinion, just as inexorably as night follows day, the jury's determination that punitive damages were warranted in this case follows from its earlier finding that the appellees' conduct constituted fraud or deceit. That this is so is obvious

from even a cursory review of what transpired in the trial court.

Although the liability phase of the trial was tried separately from the damages phase, the same jury tried both. Consequently, that jury was fully aware of the conduct, on the basis of which it assessed punitive damages. It is true that the court did not instruct the jury as to the elements of fraud or deceit. But the court did instruct the jury in terms of the conduct alleged by the plaintiffs to have been fraudulent. In that regard, the court advised the jury that if the defendant slipped the guarantees in without telling the plaintiffs or without the plaintiffs knowing that they had been slipped in, that's fraud.[1] Indeed, it was agreed that such conduct was fraud. That this is so is reflected in comments made by the trial court in the presence of all counsel:

> Now, in this case the only issue for the jury is were they [the plaintiffs] put on notice of that fact [the insertion of the guarantees]. It is conceded that they should have been. So, I guess you can argue the case whichever way you wish. If you are comfortable with sort of outlining the elements of fraud, that's fine. But everybody concedes that if the notice wasn't given, then there was a fraud,

and by the question that was propounded to the jury:

> Are you persuaded that, when [the appellant] signed the documents that he signed on December 29 and/or 30, neither he nor [his attorney] knew that additional personal guarantees had been inserted into [the completion guarantees and loan agreements]?

Having previously determined that the defendant had engaged in conduct which constituted fraud or deceit, the jury had only to decide in the damages phase of trial, whether that conduct was sufficiently egregious as to warrant the award of punitive damages. That is precisely what the trial court

---

1. That there was, in this case, "actual knowledge", in the sense that the majority defines it, cannot be disputed. One party cannot *slip* a guarantee into loan documents, without *actual knowledge* that the other party does not know it.

instructed. It told the jury that notwithstanding its prior finding, punitive damages need not be awarded, but that it could award punitive damages in such an amount "as in your sound judgment and discretion you find will serve to punish [the appellee] for the conduct you have found it engaged in in this case." Because the jury was instructed on fraud, *albeit* in terms of conduct, as opposed to its elements, to which the defendant did not interpose any objections, and the parties agreed that the jury's resolution of the factual dispute in favor of the plaintiffs would constitute the conduct engaged in by the defendant as fraud or deceit, there was no reason, as the trial court asserted, to give it a further instruction on "malice." This is consistent with the court's holding with respect to the mental state required for fraud or deceit. As I see it, therefore, the trial court correctly concluded that the plaintiffs necessarily established that the defendant acted with the actual malice required for an award of punitive damages once they proved that the defendant acted fraudulently. I would hold that the trial court did not err in refusing to give the requested "malice" instruction. Thus, in addition to reversing the judgment of the Court of Special Appeals, I would instruct that court to affirm the judgment of the Circuit Court.

I am also troubled by footnote 13, in which the majority sets forth the statutorily imposed maximum fines for criminal offenses, commercial crimes or fraud offenses. While the majority notes that "[t]here are other pertinent considerations in fixing an amount of punitive damages" and, thus, the criminal monetary penalties cannot provide a cap for a punitive damages award, it specifically advocates that "in determining whether an award of punitive damages is proportionate to the defendant's misconduct, a court may consider, *inter alia*, the legislative policy reflected in statutes setting criminal fines." 337 Md. at 242 n. 13, 652 A.2d at 1130 n. 13. If the majority is not suggesting that the monetary penalties constitute a cap and other pertinent considerations do impact on the fixing of punitive damages, it is difficult to understand the purpose of the footnote. Referring in punitive damages instructions to these maximum monetary penalties, but telling

the jury it is not a cap, would only confuse the jury and, very likely, would tend to usurp the jury function.